Good morning, Your Honors. May it please the Court. My name is Kate Stetson. I am here today in my role as a supervising attorney for the University of Virginia School of Law Appellate Litigation Clinic. I'd like to introduce the arguing advocates today. Reid Petty will be presenting opening argument. Gabby Bradford will be rebutting. We've divided the time ten and five. All right. Thank you for accepting this case on a pro bono basis and for supervising the students who will be presenting the arguments today. We appreciate it. Thank you. Good morning, Your Honor. Reid Petty for Mr. Moore. May it please the Court. This case arises from a summary judgment motion for defendants in a deliberate indifference action involving an actively suicidal inmate, Mr. Kevin Moore. I'd like to start with the subjective prong of the deliberate indifference inquiry, asking, as this Court stated in Kahn, whether defendants knew that Mr. Moore was at a heightened suicide risk and whether they failed to adequately respond to it. Under Farmer, knowledge of a substantial risk can be held or can be found in the usual ways, including through circumstantial evidence. In this case, defendants knew that Mr. Moore had told them he was suicidal, that he said he couldn't trust himself, and that a jury could find he did not want to go back to his room. They knew from reviewing Mr. Moore's medical history that he — that his siblings had recently passed away and that since then he'd been experiencing auditory hallucinations, sleeplessness, and feelings of re-traumatization. They also knew that he had attempted suicide twice in his life. From that record — It wasn't a case where they took no action or didn't treat his claim seriously, right? They took action and exercised their professional judgment. So even if we assume that somehow there was negligence or even gross negligence, that's not enough for an Eighth Amendment claim. Well, Your Honor, Jett v. Penner in this Court made clear that knowledge of a substantial risk and the knowing provision of ineffective care is sufficient to establish deliberate indifference. And in this case, there's sufficient evidence for a jury to find that defendants knew in sending Mr. Moore back to his room based on a faulty document, the Suicide Risk Assessment, or SRASHE, that they knew they were providing him with ineffective care. And if that's the case, then in sending him away, they knew of the risk and they knew that they weren't addressing it. Tell me what facts would lead to the inference that they knew that they were providing adequate care. Well, that can be found through the mistakes on the SRASHE. The obviousness of those mistakes, the number of those mistakes, and the relevance of those mistakes to the inquiry can lead a reasonable jury to find that they were systemic, that they were either the result of intentional manipulation or, at the very least, conscious error. And I think it's helpful to walk through some of those errors back-to-back so we can see how obvious they are. So starting with so the short SRASHE is divided into two sections. There's a section where one tallies up risk and protective factors and a notes section. In the section where one tallies up risk and protective factors, defendants wrote no suicidal ideation MH. In the notes section, they wrote, per IP, stated he was suicidal. In the risk and protective factors section, defendants wrote no negative housing placement and no single-cell housing placement. In the notes, they wrote that Mr. Moore was in administrative segregation. The list goes on from there, Your Honor. In the risk factors section, they wrote no symptoms of psychosis. In the notes, they wrote that Mr. Moore was experiencing auditory hallucinations. So does this meet the standard for indifference, or is it carelessness or maybe malpractice or negligence in terms of assessing? Yes, Your Honor. A jury could find that these errors are so consistent and so obvious that they are either knowing or intentional. And either way, the standard for deliberate indifference is met. So did the district court err by relying on the expert that provided testimony to the district court in support of the summary judgment motion? We believe, Your Honor, that Dr. Canning's report cannot decide this case. Dr. Canning states that the Srashe report compiled by defendant or that defendant's course of treatment was medically appropriate. But in order to draw that conclusion, he has to rely on things like Mr. Moore's affect, what Mr. Moore said, and how Mr. Moore answered the questions in the CIT interview given to him that are only answerable with information from the Srashe and defendant's notes. A jury entitled to reject the reliability of the Srashe would be entitled to reject Dr. Canning's report as well. But there was no expert, obviously no expert testimony offered below by your client, right? That's true, Your Honor. And even in the Med-Mal context, you're aware of the fact that to even get to Med-Mal, which requires a lot less than deliberate indifference in most states, you have to have expert testimony, right? That's true, Your Honor. But this Court in Sanders v. York distinguished the medical malpractice case from the deliberate indifference case, stating that or refusing to appoint an expert in a deliberate indifference case, saying that it was not necessary. Districts in this circuit, such as Reedhead v. Arizona, have taken from that case that where the symptoms of a condition are visible to the lay jury, and a lay jury can understand the condition, then expert testimony is not necessary to show a deliberate indifference. Ledford v. Silk. And I don't think we're suggesting that an expert is necessary, but it's quite an inferential leap from the errors that you rely on in the risk assessment to deliberate indifference versus just medical malpractice, even gross negligence. Well, Your Honor, we think that repeated errors, when they become — we think repeated errors can lead to an inference of systemic neglect. That doesn't seem like a wild, a wild inferential leap. If someone makes numerous obvious errors, especially direct contradictions on a three-page form, with the same person filling out both sections, by the way, it seems difficult to explain those errors other than through intentional manipulation or, at the very least, consciousness that they were being careless. And the knowing provision of ineffective medical care is sufficient for deliberate indifference. So this is a case, and we can admit, this is an extreme case where the errors are so common and so obvious that defendants — that a reasonable jury could find that defendants recognized them. Now, defendants argue that, you know, on the — now, defendants argue from Dr. Canning's report that a rational lay jury cannot make a statement about those errors on this ratio because, after all, they're not doctors. But the court in Ledford v. Sullivan in the Seventh Circuit found, as I stated earlier, that where the symptoms of a condition are within the cognizance of a lay jury, it does not take an expert to review them. We believe that a man standing before defendants with a history of mental health issues saying that he was suicidal and that he could not trust himself is obvious enough for a lay jury to understand. Didn't they determine, though, he did not have an immediate plan? And they discussed with him the fact that the following week he would see a psychiatrist who would discuss resuming medications and having a treatment regimen. And didn't they then return him to his cell where he was checked on every hour? That's true, Your Honor. They did determine that he did not have an intent or plan to commit suicide at that time. But that's not the suicide risk that Mr. Moore was expressing. He testified to that in his deposition, right? He testified in his deposition that he was suicidal and he couldn't trust himself. But he didn't. He testified that he didn't have a plan at that time. That's true. That's true, Your Honor. He accepted that at the time he did not have a plan or intent to commit suicide. But the risk in this case was that the ideation that Mr. Moore was experiencing and expressing to the CIT would ripen into intent, or that Mr. Moore would be the victim of involuntary suicide risk. So it might ripen, not certainly would ripen. Oh, I'm sorry. Could you repeat the question, please? Yes. So it might ripen, but it wasn't that it absolutely or more likely than not would. It might ripen. Well, I'm not sure I could put an exact probabilistic number on it. Right. So if you can't hear arguing for your client, how could the defendants, how could their conduct rise to the level of deliberate indifference? Well, Your Honor, we believe that a reasonable jury, seeing that Mr. Moore was expressing this risk, Mr. Moore, who has attempted suicide twice in his life, is expressing this fear about his suicide risk. When was that? It was in his youth, sir. But Mr. Moore, who has attempted these suicides, when he expresses that suicide risk, we think a reasonable jury could take that as a powerful piece of evidence of the likelihood of that risk. In fact, we think coupled with Mr. Moore's history of Mr. Moore's recent history of the loss of his siblings, the recurrence of his auditory hallucinations, his sleep deprivation, and his placement in administrative segregation, taking all of these factors together, the likelihood becomes a lot higher. And it only needs to be high enough for a reasonable jury to find that defendants recognized it. In this case, we think that prong is met. Now, at the end of my time, I'd like to just note that there are two major points of material fact that remain disputed. That is, defendants' mental state, whether Mr. Moore told defendants that he did not want to go back to his room, and whether Mr. Moore told defendants specifically that he wanted to get into a mental health crisis. Those are crucial to the case. Thank you, Your Honor. Thank you very much. Thank you. Thank you.  May it please the court, Deputy Attorney General Christian Georgely, on behalf of defendants Gomez, Dunlop, and Nix. The court should affirm the district court's order granting summary judgment, or alternatively, affirm on qualified immunity. As members of the crisis intervention team, defendants are highly trained experts, tasked with assessing a prisoner's mental health, and referring them for immediate intervention when needed. For Moore, the team assessed his risk of suicide based on his mental health records, a 20-minute interview, and applying CDCR's suicide risk assessment, an evaluation that incorporates the accepted medical health standard of care outlined in the Columbia Suicide Severity Risk Scale. This assessment and standard of care require the team to use their expertise to determine the medically acceptable care. After assessing Moore, the team took the extra step of consulting with the clinician supervising the institution's mental health crisis unit to double check their assessment that Moore had a high chronic risk of suicide, but did not require immediate intervention because of his low acute risk of suicide. And even then, the team did not do nothing. They returned Moore to his existing housing, as this court noted, where correctional officers and psychiatric technicians would check on Moore's well-being at least every 30 minutes. So counsel, I'm looking, and I'm not 100% sure I have the ER reference correct, since I have a lot of numbers at the bottom of my page, but perhaps ER 136, which is Jonna Dunlap's notes from July 3, and I'm looking at her notes, per IP, stated he was suicidal, right? Yes, Your Honor. So why isn't that enough to trigger a duty to do more than simply look at further non-acute treatment, especially because he hadn't been on meds in quite a while? There had been, what your friends pointed out, sibling deaths, and what to anyone would be a very traumatic situation where he was a murder suspect and apparently had been cleared, but the record seems to me a little ambiguous in that regard. Why, when combined with I am suicidal, why doesn't that trigger more than, well, we'll have somebody look at him? Well, Your Honor, if I may, the team did more than we'll have someone look at him, but as to the question about the statement of the suicide, being suicidal, as the Columbia Standard confirms, there's a difference between feeling suicidal, which Moore expressed here, and having an intent and plan of suicide or having recent suicide attempts that would trigger an immediate response. All of those, Mr. Moore denied, and which are the only factors that the Columbia Standard considers and relies on to recommend more urgent intervention. But I'm looking on that same page where Ms. Dunlap says IP has some protective factors that may mitigate his risk for suicide. Shouldn't that have triggered more than was done here? Your Honor, in light of those responses, the medical standard didn't require more, because what the team did is in light of those factors, which they were, those specific factors, the team took a holistic approach in understanding Mr. Moore's immediate risk of harm. The team even went as far as to call and consult with the clinician supervising the institution's mental health crisis unit, the unit where Mr. Moore afterwards believes that he should have been sent to. A difference of medical opinion, especially when there's no evidence in the record showing that the course of treatment provided here was improper, the course of treatment the team recommended here fails to rise to the level of an Eighth Amendment violation. We're on a summary judgment, right? So I think what Mr. Petty's point, if I understand it correctly, is that sometimes the facts are so compelling that there are inferences that can be reached. So we're just, all we need at this point is a triable question. Why isn't there a triable question here in light of some of the facts that Judge Bennett pointed out and Mr. Petty argued? Setting aside qualified immunity for a moment, because as I understand it, the district court didn't reach that issue. Yes, Your Honor, the district court didn't reach qualified immunity. But as to your first point, many of the argued inaccuracies are counsel's recharacterization of the record, not factual disputes. Regardless, mistakes don't rise to the level of deliberate indifference and none of the argued errors would have changed the acute suicide risk determination. And as the Columbia Standard confirms, there's a difference between being suicidal and having a suicide plan, intent, or recent suicide attempts, all of which Mr. Moore denied. And those are the key factors that the standard of care outlined in the Columbia Standard identifies the baseline for requiring more urgent intervention. And despite the absence of those factors, the team did more than the medical standard of care. They, as I've repeated, as I've stated earlier, they consulted with the clinician supervising the mental health crisis unit. You are not deliberately indifferent when you seek out a second opinion. That is medical, those are clinicians doing their best to render the necessary care for an incarcerated individual. And again... Counsel, I'm sorry. This is probably a fairly irrelevant fact that is unclear to me in the way that I see both things. But after the plaintiff hung himself and he was discovered in the cell, I see records that say both that he was non-responsive and that he was responsive. Is there any agreement, again, not that it may make a difference, whether when he was discovered in the cell, whether he was or wasn't responsive? Your Honor, I can't comment right now about that.  That's fine. Because, and if I may address the first point, whether or not that exists should not be determinative or considered in the knowledge, because in determining the subjective problem of the deliberate indifference test, it's what did the specific providers know when they encountered... Right. No, no. This clearly happened after the relevant time, but I was just a little confused by that. But go ahead. Let me ask you this, Counsel. You said, alternatively, we could affirm on qualified immunity grounds. And as we discussed, that's not something that the district court reached. Wouldn't we remand for the district court to analyze that question in the first instance if we were to disagree with your position on the deliberate indifference? No, Your Honor. This court is equipped to handle questions of law such as qualified immunity. This court reached a similar holding in Shoshone where qualified immunity, when not addressed below, is properly considered by this circuit court. But the court should affirm on qualified immunity grounds in the alternative. The best cases for Mr. Moore are Kahn and Clouthier. Both facts are materially distinguishable and much more egregious than the affirmative care that the crisis intervention team provided here. Specifically in Kahn, that case is distinguishable because what occurred there was the defendants witnessed the decedent attempt suicide and make threats of suicide and withheld that information. This court should instead consider Simmons as illustrative. In Simmons, based on the information known to those clinicians, there was evidence to make a low acute risk of suicide based upon worse facts. The court affirmed summary judgment on the merits when a clinician downgraded the suicide risk while knowing of recent suicide attempt the prior month, knowing the decedent had severe depression, and knowing there was a present risk of a suicide attempt. Here, Mr. Moore had no plan or intent of suicide, had not attempted suicide for two decades. If this court has held that the merits, have affirmed summary judgment on the merits in Simmons, the law cannot be considered clearly established to show that egregious conduct which occurred here was clearly established. So the court could reach, affirm on qualified immunity on those grounds as well. And if I may highlight for the court, in Farmer versus Brennan, the landmark Supreme Court case on the Eighth Amendment delivered a different standard, the Supreme Court held that officials who actually know of a suicide risk, know of a substantial risk of serious harm, may be free from liability if they responded reasonably, even if the harm was not averted. The court in Simmons noted that even if they wish that the clinicians in Simmons had done something different, that's not what the Eighth Amendment requires. The clinicians here acted on what information they knew, knowing Mr. Moore had no plan for suicide, knowing he had no intent of suicide, no recent suicide attempts, consulted with the clinician of the mental health crisis unit. They returned him to a solitary cell though, rather than place him in a crisis bed where he would have had observation and scrutiny every 30 minutes, isn't that correct? He made a decision. I don't believe there's anything in the record describing what the mental health crisis unit would provide, but the existing housing unit that Mr. Moore was returned to had regular checks by both correctional officers and psychiatric technicians to confirm the well-being of individuals. Again, had Mr. Moore, this court might believe that in hindsight, maybe more conduct, a different action could have happened, but that's not what the Eighth Amendment requires. The Eighth Amendment requires conduct contradictory to clearly established medical standard of care. The only evidence regarding the medical standard of care affirms that the decision, the medical care provided to Mr. Moore met that standard of care, and even if they didn't meet the standard of care, the Eighth Amendment requires more. And I see you don't have any more questions. If I may, defendant's request that the court affirm. Thank you. Thank you, counsel. Gabby Bradford on behalf of Mr. Kevin Moore. First, I'd like to address the absence of a specific intent or plan. There is no legal requirement that an individual specifically address a specific plan to kill himself or an intent to do so. In Lemire v. California Department of Corrections, this court held that leaving mentally ill inmates alone for a number of hours was a violation of the Eighth Amendment, despite the fact that they had never articulated an intent to commit suicide or a plan for doing so. In Kahn, there was no specific intent. Yes, the individual there had threatened to kill themselves, but they did not ever state that they wished to do so or somehow desired to do so. This intent or plan distinction is entirely manufactured in this dispute and does not exist anywhere else. But is it not a clinical decision? You're right, it may not be a legal standard, but the clinicians who reviewed him and the psychiatric folks who did the assessment determined that that was an important factor. Well, here the clinicians who conducted the assessment rather did a holistic assessment of all the specific risk factors and the protective factors, which did include things like psychosis and age or gender and things that went much further beyond a specific intent or a specific plan. Here, there's a very clear and obvious inference that when somebody states that they're suicidal, that they're at a heightened risk of committing suicide. And defendants assert the srashi to sort of defend or rebut that obvious inference, but the srashi is littered with errors. And my friend on the other side has really tellingly no response to any of the errors that my co-counsel pointed out in his opening argument. Well, I think that that's not a correct characterization. I think that the response is even if there were errors that even rise to the level of medical malpractice or even gross negligence, that that doesn't rise to the level of deliberate indifference. So there may not be a justification for making an error, but I think your friend argues that even if there are errors, it doesn't rise to deliberate indifference. Absolutely, and I apologize for that mischaracterization. No, that's no problem. What I mean to say is that there are no specific answers for each of the defined discrepancies on the face of the srashi. And, you know, as I was mentioning previously, the obvious inference is that when someone's suicidal, that they're at a heightened risk. The srashi is meant to defend, you know, defendant's decision, but it's littered with errors from which someone could conclude, but a jury would not have to conclude that he was deliberately indifferent. A jury could find that they were negligent in filling out the srashi, but they could just as easily find that they were knowingly careless in filling out the srashi or that they somehow shaded the answers to produce a desired result. This is due to both the number of factors that were recorded inconsistently on the srashi, but also the nature of the factors that were recorded inconsistently. It's very telling that suicidal ideation is one of the factors that was recorded incorrectly, as was the symptoms of psychosis or the simple fact of being in a cell by himself. That was something that was fairly obvious to anybody and was recorded as being an administrative segregation. The second thing I'd like to address is the qualified immunity issue. First, we would argue that this court should not cite the issue so that it could be properly addressed and argued below before the court reaches it. But secondly, it is clearly established that when an individual faces a heightened risk of suicide, that officials are meant to take risks to prevent that suicide from occurring. A reasonable officer in the position of officials here, had they known that he was at a substantial risk of suicide, would know that failing to return him to the mental health crisis bed is a violation of the Eighth Amendment. Counsel, the Supreme Court from time to time has cautioned us not to decide qualified immunity cases based on a high level of generality. What would be the best case that you could point to that would have put these defendants on notice that their actions were a constitutional violation, not at a high level of generality? Sure. I think Castro is probably the best case for defining the scope of the level of generality, but the case that would put them on notice would be probably Kahn. There, the court held that taking affirmative steps to prevent suicide is something that is encapsulated by the Eighth Amendment, and that when officials know that someone is suicidal or at risk of killing themselves, that they must take affirmative steps to prevent that outcome from occurring. In Castro, this Court held that the level of generality with which to define clearly established law in the Eighth Amendment context is when the contours of the right are sufficiently clear that a reasonable officer would understand that what he's doing violates that right. Here, that is clear. If there are no further questions, we ask this Court to reverse. All right. Thank you very much to both sides for your arguments. Thank you. Well done, Mr. Petty and Ms. Bradford, and thank you again, Ms. Detson. The matter is submitted, and we'll issue our decision in due course, but I do wish the law students the best of luck in your career, and on behalf of my colleagues as well, thank you. Absolutely. Thank you for your excellent performances. This is all counsel, including the students who are very, very talented and performing a public service, so thank you very much. Well done. Thank you.
judges: NGUYEN, BENNETT, Matsumoto